UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL DEUTSCH,<br><br>          Plaintiff,<br><br>     v.<br><br>DOUGLAS W. COOK,<br><br>          Defendant. | No.  1:19-cv-281-KES-SKO<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW<br><br>(Doc. 80) |

Plaintiff Michael Deutsch brought this action against defendant Douglas Cook following the parties' unsuccessful business venture to develop and market the "Dialfan" medical device for use in hernia surgeries.  The parties tried the case to the Court in a bench trial on Deutsch's two causes of action: unjust enrichment (quasi-contract claim for restitution) and quantum meruit. *See* Doc. 80; Doc. 71; Doc. 26 (First Amended Complaint ("FAC")).  Following trial, the parties submitted proposed findings of fact and conclusions of law and responses thereto.  Docs. 86, 87, 88, 89.  The Court sets out below its findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(a)(1).

## I.    FINDINGS OF FACT

1.    Cook is a medical doctor.  In late 2007 or early 2008, Cook began practicing as a general surgeon in California's Central Valley.  Doc. 85 ("Trial Transcript" or "Tr.") at 169:14–18.

1

2.  Cook invented the Dialfan medical device out of frustration with existing hernia repair techniques. Tr. 171:8–172:21; Doc. 71 ("Second Pretrial Order"), Undisputed Fact 1.

3.  The Dialfan device consisted of a placement tool to be used with a mesh patch in performing hernia surgeries.  The placement tool consisted of adjustable blades and a control to move the adjustable blades from a clustered position (in which the blades are stacked on top of each other, thereby allowing the blades to be inserted through a small opening in the mesh patch), into an expanded position (to spread out and apply the mesh patch evenly).[1]  *See* Second Pretrial Order, Undisputed Fact  2.

4.  Cook initially paid engineers to develop technical drawings of the Dialfan.  Tr. 174:6–23; Tr. 174:24–175:4.  Cook then had a few metal prototypes of the Dialfan manufactured by a local machine shop.  Tr. 176:13–18.

5.  With his employing health network's approval, Cook subsequently used the Dialfan prototypes in hernia surgeries on patients.  Tr. 176:15–17, 177:18–178:4.  In late 2009 and early 2010, Cook successfully performed approximately 20 surgeries using the metal Dialfan prototypes.  Tr. 178:7–9, 179:12–13.

6.  To use the metal Dialfan to apply mesh in surgery, Cook modified a mesh produced by a company called Atrium by cutting a slit in the top of the mesh to allow for the insertion of the metal Dialfan blades.  Tr. 182:19–184:3.

7.  The Atrium mesh, with the modifications that Cook made, was the only mesh that would work with the Dialfan.  Tr. 182:25–183:3, 184:2–3.

8.  Because Atrium later went out of business and no longer produces the mesh that Cook modified for use with the Dialfan, Cook no longer uses the Dialfan in surgery. Tr. 182:25–183:3.

9.  As of late 2009, Cook had incurred all costs spent to develop the Dialfan, in addition

---

[1] Though the parties at times refer to the Dialfan as consisting of both the mesh and the placement tool device (*see* Second Pretrial Order, Undisputed Fact 2), they most frequently use the term "Dialfan" to refer to the placement tool only and refer separately to the mesh.  Following the parties' usage, these findings of fact also generally refer to the Dialfan tool and the mesh as separate items.

to using his own time.  Tr. 174:19–175:15, 176:11–177:14.

10. In late 2009, a colleague suggested that Cook connect with a medical device company owner, Deutsch, to discuss further development of the Dialfan.  Tr. 31:24–32:14, 179:17–180:3.  Deutsch markets and sells medical devices through his company Starsurgical.  Tr. 6:20–7:4; Second Pretrial Order, Undisputed Fact 3.

11. Cook and Deutsch spoke, and Deutsch then traveled to California to observe Cook using the Dialfan in surgery.  Tr. 32:18–33:25, 181:22–182:12; Second Pretrial Order, Undisputed Fact 3.  Deutsch met with Cook and observed Cook perform multiple hernia surgeries using the Dialfan. Tr. 34:1–2, 34:17–21, 182:10–12; Second Pretrial Order, Undisputed Fact 3.

12. The parties had conversations in which Cook said the two "should work together" given Deutsch's experience, and the parties discussed the arrangement between them to commercialize the Dialfan.  Tr. 34:9–11, 36:6–11; *see also* Tr. 182:1–186:25.  Cook and Deutsch ultimately agreed to collaborate to commercialize the Dialfan.  Tr. 181:5–6, 185:2–11, 210:12–15; Second Pretrial Order, Undisputed Fact 4.

13. Deutsch acknowledged that these conversations led to "a partnership" or "a joint venture" in which they would "share in the Dialfan." Tr. 36:12–13, 37:7–12, 64:2–18, 65:1–13, 88:24–25, 89:7–9, 108:9–10, 112:3–114:22, 116:1–117:1, 119:15–120:4, 123:16–18, 124:25–125:1, 133:18–134:4; *see also* Tr. 186:13–25.

14. The two agreed that they would share the risks and rewards, which included potential profits and losses, with Cook maintaining a 51% interest and Deutsch having a 49% interest.  Tr. 37:12–21, 112:3–114:22, 116:23–117:1; Second Pretrial Order, Undisputed Fact 6; *see also* Tr. 186:18–19; Tr. Exs. JX-1, JX-2.

15. Deutsch never requested, and Cook never agreed to, any payment for Deutsch's services related to Dialfan apart from him having a 49% interest in any potential profits.  Tr. 114:23–25, 206:14–20.

16. The parties did not agree on a termination date for the attempt to market the Dialfan and no performance metrics or deadlines for achieving sales goals were set.  Second

3

Pretrial Order, Undisputed Fact 10.

17. At some point, Deutsch advanced $45,000 to the parties' venture on an interest-free basis. *See* Trial Exs. 17, 65 at 1; Second Pretrial Order, Undisputed Fact 8.

18. The parties engaged in negotiations through counsel to formalize their business relationship, resulting in two final draft documents: (1) a Shareholder Agreement defining their relationship and ownership percentages, and (2) a Subscription Agreement detailing their respective capital contributions. Tr. 88:6–14, 115:6-117:1, 117:2–11, 119:15–120:4, 186:1–2, 186:11, 186:18–19, 187:22–23; Trial Exs. JX-1, JX-2. These agreements reflected the parties' understanding of their oral agreement. Tr. 89:10–11, 90:15–21, 115:6–117:1, 117:2–11, 119:15–120:4, 186:1–11, 186:18–19, 187:22–23.

19. Cook signed both the Shareholder Agreement and Subscription Agreement, but Deutsch did not execute either document. Tr. 88:19–89:4, 186:11–12; Tr. Exs. JX-1, JX-2; Second Pretrial Order, Undisputed Fact 7. While Deutsch did not sign the documents, he acknowledged at trial that he believed the parties already had an oral agreement to the same effect as the Shareholder Agreement and Subscription Agreement and that there "was no need to use" the documents. Tr. 89:10–11, 90:15–21, 116:23–25.[2]

20. The parties brainstormed about how the venture should proceed, "discussed things openly," spoke frequently regarding what each "discovered for the week with the people [each] talked to, and had an "exquisite working relationship." Tr. 102:23–24,

---

[2] Cook similarly testified that he referred to their actions together as a partnership or joint venture, that the two of them "felt the way [they] felt about each other, that they were on a handshake deal, that [they] were forming a partnership," and that that the proposed written agreements detailing a 51 and 49% ownership split constituted "the gist of [the parties'] [oral] deal." Tr. 186:4–25, 216:23–217:2; *see also* Tr. 207:8-10 (testifying that the two had a "verbal partnership"); Tr. 221:21–222:3 (testifying that the two had a "verbal partnership and relationship" and "whatever that means in the state of California, [he] would be obligated to"); Tr. 236:3–6 (testifying that the parties' "business relationship . . . to commercialize the Dialfan was largely from 2010 to 2015"). Additionally, Cook referenced that he was "51% stakeholder" of the joint venture in an email he sent to Deutsch. Tr. Ex. 64 at 1.

185:2–11, 237:25–238:11, 242:7–14.

21. Deutsch's assertion at trial that he lacked control sufficient for the parties to be in a joint venture together is unpersuasive. The testimony showed that the partners made decisions regarding the joint venture together, "discussed things openly," and spoke often regarding what each "discovered for the week with the people [each] talked to." Both parties acknowledged that the two acted as partners and were in a partnership regarding commercialization of the Dialfan.

22. Cook, given his greater medical expertise, had control and responsibility for the design of the Dialfan. Deutsch, given his greater expertise in commercializing medical devices, assumed control and responsibility for working with potential manufacturers and distributors and for marketing. Deutsch was in control, among other things, of which and how many trade shows to attend and which manufacturers, distributors, and licensors to engage with, what to ask them to create or do for the parties, and how long to engage with them.

23. At some point in 2010, early in the parties' relationship, Cook became concerned about the durability of the metal Dialfan, with the wings' metal nubs shearing after repeated use, and the parties began to explore the concept of commercializing a plastic Dialfan. Tr. 40:21–25, 51:23–52:11, 189:13–190:10.

24. The evidence does not support Deutsch's contention that "Dr. Cook only would permit the commercialization of a plastic Dialfan and not a metal one" over Deutsch's objections. *See* Doc. 88 at 19. Rather, when asked whether he and Cook disagreed over whether to commercialize a plastic or metal Dialfan, Deutsch testified equivocally that "maybe it's a characterization," that the parties were "in discussions," and that "[he] guess[es] you could say that." *See, e.g.*, Tr. 123:20–124:2. Deutsch did not remember any specific conversation expressing concern to Cook over the plastic Dialfan, but remembers thinking that "[they] had an instrument that worked" in the metal Dialfan and that they should "at least go out and identify the market [and] see the level of interest that [they] had" in it and that he believed then and now that the

5

most successful way to have commercialized the Dialfan was to sell a metal Dialfan. Tr. 41:13–20.

25. Ultimately though, following the parties' discussions, Deutsch "went along with" Cook's preference to commercialize a plastic Dialfan rather than a metal Dialfan. Tr. 41:2–22; *see also* Tr. 242:4–14 (Cook testifying it made more sense to him to sell a plastic Dialfan given that the metal Dialfans were expensive and wore out, but he was not giving Deutsch "marching orders").

26. The joint venture's focus thus narrowed to trying to commercialize a plastic Dialfan.[3]

27. The parties also proposed to produce a mesh for the Dialfan, so that a surgeon using the Dialfan would not have to modify an existing on-the-market mesh each time to use the Dialfan.  Tr. 191:20–192:9.

28. The decision to attempt to commercialize a plastic one-time-use Dialfan with an accompanying mesh increased Deutsch's responsibilities and time incurred on the venture, as Deutsch assumed the responsibility to find a manufacturer for a plastic Dialfan and for the mesh.  Tr. 41:23–43:19, 49:11–15.

29. While Deutsch testified that he had conversations with Cook about the increase in his time that commercializing a plastic Dialfan would require, he did not recall the specifics of what he said in those conversations.  *See* Tr. 42:20–43:9.  Deutsch acknowledged, regarding his new increased responsibilities, that "this was not an adversarial thing at this time" between him and Cook.  Tr. 57:6–15.

30. As part of his efforts on behalf of the partnership, Deutsch engaged in discussions related to commercialization of the Dialfan with various potential suppliers, manufacturers, and distributors including, among others, Proxy Biomedical Ltd. ("Proxy") and Laacke & Joys.  Tr. 72:10–73:14.  Cook did not find Proxy or Laacke &

---

[3] Although Cook testified he would have considered the possibility of Deutsch selling a metal Dialfan to garner the income required to move forward with the venture to commercialize a plastic Dialfan, *see* Tr. 198:23-199:12, the joint venture's focus was on to trying to commercialize a plastic Dialfan.

Joys, nor ask Deutsch to contact either of those companies.  Tr. 50:25–52:11, 67:8–15, 190:10–11.

31. As a result of Deutsch's efforts with Proxy, Proxy created engineering drawings of a plastic Dialfan and created a proposed term sheet regarding a potential agreement between Proxy and the parties' "Joint Venture Entity."  Tr. 51:23–52:11, 53:8–23, 59:18–60:16, 61:25–62:11, 65:17–66:15; Tr. Ex. 8 at 8–10.  Deutsch also had Proxy make one or two plastic Dialfan prototypes.  Tr. 132:6–15.

32. Deutsch acknowledged that Cook was not involved and did not need to be involved in Deutsch's efforts with Proxy; rather, Deutsch kept in touch with Cook regarding Deutsch's efforts, with Proxy and otherwise, and communicated to him any updates.  Tr. 66:16–67:2, 190:14–24.

33. In the end, the parties did not reach an agreement with Proxy.  Tr. 138:13–24, 192:10–20.

34. As a result of Deutsch's efforts with Laacke & Joys, Laacke & Joys created detailed drawings of a plastic Dialfan and quotations of the cost of manufacturing a mold to produce plastic Dialfans as well as the cost per plastic Dialfan once the mold was created.  Tr. 68:4–69:9, 71:3–18; Trial Exs. 23–24.

35. When a potential issue with the Dialfan patent arose, Deutsch would call his attorneys and make sure the issue was handled, but Cook did not ask Deutsch to call his attorneys about the patent issue.  Tr. 146:5–15.

36. At trial Deutsch produced receipts totaling $1,820.00 for patent work, (Tr. 145:21–148:4; Tr. Exs. 49, 53), but it is unclear whether these fees were paid by Deutsch personally or from the venture's account (*see* Tr. Ex. 50).

37. Separately, Cook sent Deutsch a $5,000 bill related to European patent work, which Deutsch paid.  Tr. 99:7–10, 154:24–155:8, 192:21–25.

38. During the parties' partnership, Deutsch attended multiple trade shows at which he marketed medical devices in the Starsurgical portfolio to surgeons, and he also brought and displayed the proposed Dialfan at the trade shows.  Tr. 73:21–76:21,

7

191:2–5.  Deutsch would have attended the trade shows regardless of whether he was marketing the Dialfan.  Tr. 79:13–15, 191:2–5.  Cook did not request that Deutsch attend any of the trade shows.  Tr. at 191:10–11.

39. Despite these marketing and outreach efforts, Deutsch's work did not result in: (a) a licensing or other development agreement; (b) a single sale; (c) any modification or improvement to the device; (d) any commercial success; or (e) a single dollar of revenue to the parties' venture.  Tr. 133:8–137:11, 204:7–9; Second Pretrial Order, Undisputed Fact 13.

40. In or about June 2015, the joint effort to commercialize the Dialfan concluded.  Second Pretrial Order, Undisputed Fact 11.  The Court finds based on the evidence that the parties mutually ended the joint venture because its purpose to commercialize the Dialfan product had failed.

41. Cook never promised to pay Deutsch for his marketing efforts, and Deutsch did not expect, and the Court finds Deutsch was not entitled to, any compensation for his time beyond potential profit sharing if the venture was successful.  *See* Tr. 106:20–107:6, 143:15–21, 159:22–24, 206:14–20.

42. Cook nonetheless repaid Deutsch the $45,000 advance, partially with the funds that remained in the venture's bank account and partially from Cook's personal funds.  *See* Second Pretrial Order, Undisputed Fact 9; Tr. Exs. 64, 65.

43. Near or around the end of the parties' joint venture, Cook paid to have a plastic prototype Dialfan made, which he still possesses.  Tr. 194:10–18, 202:5–6.

44. There was no evidence that either party requested an accounting of the joint venture, or that either party incurred any expenses or costs exceeding their pro-rata share of the joint venture's expenses and costs.

45. After the parties' joint venture ended, Cook attempted to continue development efforts through other channels, including communicating with representatives from various businesses, hiring a consultant, and pursuing discussions with other potential partners.  Tr. 202:5–203:20, 244:5–18.  None of Cook's post-partnership efforts to

commercialize the Dialfan proved successful. Tr. 201:25–203:20, 204:3–9, 244:15–16.

46. Cook no longer uses the remaining Dialfan prototypes, as the manufacturer of the required mesh went out of business and the mesh is no longer available. Tr. 182:25–183:3.

## II.    CONCLUSIONS OF LAW

1. To prevail on a claim for quantum meruit, a plaintiff must prove (1) that the plaintiff performed certain services for defendant, (2) the reasonable value of the services, (3) that the services were rendered at the defendant's request, and (4) that the defendant did not pay for them. *Sharp Mem'l Hosp. v. Regence BlueCross BlueShield of Utah*, No. 16cv2493 JM (RNB), 2018 WL 3993359, at *9 (S.D. Cal. Aug. 21, 2018) (citation omitted); *see also* Second Pretrial Order at 8.

2. To prevail on a claim for unjust enrichment (restitution), a plaintiff must prove that the defendant (1) received a benefit and (2) unjustly retained the benefit at the plaintiff's expense. *MH Pillars Ltd. v. Realini*, 277 F. Supp. 3d 1077, 1094 (N.D. Cal. 2017) (citation omitted); *see also* Second Pretrial Order at 8.

3. "A joint venture exists when there is 'an agreement between the parties under which they have a community of interest, that is, a joint interest, in a common business undertaking, and understanding as to the sharing of profits and losses, and a right of joint control.'" *Connor v. Great W. Sav. & Loan Ass'n*, 69 Cal. 2d 850, 863 (1968) (quoting *Holtz v. United Plumbing & Heating Co.*, 49 Cal. 2d 501, 506–07 (1957)). "[A] community of interest . . . may exist although the property forming the capital of the venture is not jointly owned by the parties and although one of the parties has contributed money and property and the others labor and skill." *Drdlik v. Ulrich*, 21 Cal. Rptr. 642, 644 (Cal. Ct. App. 1962).

4. "The fact that there is to be an unequal distribution of the profits . . . does not contravene the idea of a joint venture." *Id.* "This is also true of the actual control of operations." *Id.*; *see also Orosco v. Sun-Diamond Corp.*, 60 Cal. Rptr. 2d 179, 184

9

(Cal. Ct. App. 1997) (noting control in a joint venture may be delegated).  "It may be that given [one of the venturer's] greater expertise in design and construction, the actual building of the house was delegated to [him]."  *Scottsdale Ins. Co.  v. Essex Ins. Co.*, 119 Cal. Rptr. 2d 62, 68 (Cal. Ct. App. 2002) (noting that, where two parties had agreed to use one's land and the other's construction skills to build and sell a house, the actual building of the house may have been delegated solely to venturer with expertise in construction and noting that relevant question regarding control was not whether the venturer owning the land had any control over other party's construction business but rather whether the building of house was a joint venture).

5.  Cook and Deutsch had a joint interest in a common business undertaking and an understanding as to the sharing of profits and losses regarding that undertaking.[4] Specifically, the parties had a joint interest in a common business undertaking to commercialize the Dialfan.  *See supra* Findings of Fact ¶¶ 12–15.

6.  Sometime in 2010, the parties agreed to narrow their intended undertaking to focus on commercializing a plastic Dialfan, rather than a metal Dialfan.  *See supra* Findings of Fact ¶¶ 23–26.

7.  The parties agreed to split profits and losses, with Cook maintaining a 51% interest and Deutsch maintaining a 49% interest in the venture.  *See supra* Findings of Fact ¶ 14.  The parties also jointly exercised control over the venture, with each party delegating primary control of certain aspects of the venture to the other.

8.  Deutsch's assertion that "Dr. Cook was able to terminate Mr. Deutsch's services 'over Mr. Deutsch's objection'" is inconsistent with the evidence that both parties intended to end the joint venture because the efforts to develop and market the Dialfan were unsuccessful.  Moreover, even if the evidence had shown that Cook unilaterally ended the parties' agreement, that would not support Deutsch's argument that the joint venture never existed.  One party's repudiation of the joint venture would not

---

[4] Deutsch does not contest that these two elements of a joint venture are met.  *See* Doc. 88 at 18–19.

10

retroactively change the nature of the parties' relationship; rather, it could potentially give rise to a cause of action to enforce the joint venture agreement or for breach of the joint venture agreement. But Deutsch did not assert such claims. The evidence also did not show that Deutsch "objected" to any such alleged termination.

9. Given that the parties had a joint interest in a common business undertaking to market and sell the Dialfan, an understanding as to the sharing of profits and losses, and a joint right of control, a joint venture between Cook and Deutsch existed.

10. "Ordinarily [venturers] cannot sue each other for damages based on [joint venture] business, at least not until there has been an action for dissolution and accounting." *See, e.g.*, *Corrales v. Corrales*, 129 Cal. Rptr. 3d 428, 432 (Cal. Ct. App. 2011).

11. Deutsch did not bring an action for dissolution and accounting. *See generally* FAC.

12. An exception to the general rule laid out in *Corrales* is that where one venturer wrongfully repudiated the joint venture, the other may sue him for breach of the joint venture agreement (*i.e.* breach of contract) without first seeking a dissolution and an accounting. *See Gherman v. Colburn*, 140 Cal. Rptr. 330, 343 (Cal. Ct. App. 1977); *see also Corrales*, 129 Cal. Rptr. 3d at 433 (citing *Gherman* for the same proposition). That is, "[w]here a partner or joint venturer wrongfully repudiates the partnership or joint venture agreement and converts the assets of the partnership or joint venture to his own use and benefit, the victim . . . has alternative remedies: he may waive the tort or breach and sue to specifically enforce the partnership or joint venture agreement, including the remedy of a judicial dissolution and an accounting and if necessary (as an auxiliary remedy) to impress a trust on partnership or joint venture property[;] or the victim may submit to the repudiation and sue for damages for conversion of his interest in joint venture assets; or the victim may submit to the repudiation and sue for damages for breach of the joint venture agreement (including 'profits which might have been made') the same as any other action for damages for breach of any other contract[;] or he may sue in tort." *Gherman*, 140 Cal. Rptr. at 343 (cleaned up). Deutsch did not bring such a claim in this action.

13. Unjust enrichment, brought under a theory of quasi-contract claim for restitution, and quantum meruit are both quasi-contractual claims. *See, e.g.*, *Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 49 Cal. Rptr. 2d 191, 197 (Cal. Ct. App. 1996) (noting that "quantum meruit" is another name for "quasi-contractual recovery"); *Copart, Inc. v. Sparta Consulting, Inc.*, 339 F. Supp. 959, 983–84 (E.D. Cal. 2018) (an unjust enrichment claim can be construed as a quasi-contract claim for restitution).

14. "A plaintiff may not . . . pursue or recover on a quasi-contract claim if the parties have an enforceable agreement regarding a particular subject matter." *Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293, 330 (Cal. Ct. App. 2012); *see also Hedging Concepts*, 49 Cal. Rptr. 2d at 197 (same).

15. A plaintiff may also assert a standalone claim for unjust enrichment "outside of quasi-contract." *See, e.g.*, *Genasys Inc. v. Vector Acoustics, LLC*, 638 F. Supp. 3d 1135, 1153–54 (S.D. Cal. Nov. 1, 2022) (citing *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016). But "[u]njust enrichment is an equitable rather than a legal claim [so] no action for unjust enrichment lies where a contract governs the parties' relationship to each other." *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir. 2003).

16. "A plaintiff is the master of his complaint and responsible for articulating cognizable claims." *Newtok Village v. Patrick*, 21 F.4th 608, 616 (9th Cir. 2021). "[I]f a plaintiff [is] uncertain as to whether the parties had entered into an enforceable agreement, the plaintiff [is] entitled to plead inconsistent claims predicated on both the existence and absence of such an agreement." *Klein*, 137 Cal. Rptr. 3d at 330.

17. Deutsch did not plead any claim predicated on the existence of a joint venture agreement. *See* FAC ¶ 19 ("Cook and Deutsch never entered a partnership agreement, joint venture agreement, or any other contract governing their efforts to bring the Dialfan to market.").

18. Deutsch elected to bring only claims for quantum meruit (quasi-contract) and unjust enrichment, under a theory that no valid joint venture between the parties existed. *See*

*generally* FAC.  Deutsch elected not to bring a claim, in the alternative, for dissolution of the venture and an accounting, or for breach of the joint venture agreement, under a theory that a valid joint venture existed.[5]  *See generally* FAC.

19. As noted above, however, the evidence at trial showed that the parties orally agreed to the joint venture.

20. Deutsch did not bring any claim under the parties' agreement—either to enforce the agreement or for breach of the agreement—and he fails to establish and may not recover on his elected claims of unjust enrichment and quantum meruit.

21. Even if Deutsch could recover on an unjust enrichment or quantum meruit theory, the Court finds that Deutsch failed to prove either claim by a preponderance of the evidence.

22. As to his unjust enrichment claim, Deutsch did not show that Cook, as opposed to the joint venture, received a benefit based on Deutsch's work or expenditures, or that Cook unjustly retained any such benefit.  Both parties contributed their time and efforts to attempt to benefit the joint venture.  Nor did Deutsch show that his net expenses and costs for the joint venture exceeded his pro rata share of the venture's overall expenses and costs.

23. As to his quantum meruit claim, the evidence showed that Deutsch performed his share of the joint venture's work on his initiative, in hopes of sharing in the future profits of the venture, and not as services rendered to Cook at Cook's request.

24. Ultimately, the parties' joint venture failed to produce any returns despite both parties' best efforts, and the evidence did not show that the Dialfan has any residual value.

///

---

[5] In his response to Cook's proposed findings of fact and conclusions of law, Deutsch argues for the first time that "if Mr. Deutsch and Dr. Cook had indeed formed a joint venture, Dr. Cook was forbidden from terminating the venture to pursue the Dialfan opportunity on his own" and that Cook would have owed him fiduciaries duties.  Doc. 88 at 19–20.  Even if true, this argument made for the first time in response to Cook's proposed findings of fact and conclusions of law cannot retroactively allege causes of action for breach of the joint venture agreement or breach of fiduciary duty that Deutsch chose not to plead in the FAC and that he did not present at trial.

## III.   CONCLUSION

For the reasons set forth above, plaintiff Deutsch failed to establish his claims for unjust enrichment and quantum meruit against defendant Cook by a preponderance of the evidence.

The clerk of court shall enter judgment in favor of defendant Cook and close this case.

IT IS SO ORDERED.

Dated:   March 31, 2026

_____
UNITED STATES DISTRICT JUDGE